FILED

November 25 2014

*Ed Smith*
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 13-0793

DA 13-0793

IN THE SUPREME COURT OF THE STATE OF MONTANA

2014 MT 309

IN THE MATTER OF:

S.M.,

Respondent and Appellant.

APPEAL FROM: District Court of the Eleventh Judicial District,
In and For the County of Flathead, Cause No. DI 10-071(B)
Honorable David M. Ortley, Presiding Judge

COUNSEL OF RECORD:

For Appellant:

Robin A. Meguire, Attorney at Law, Great Falls, Montana

For Appellee:

Timothy C. Fox, Montana Attorney General; Tammy K Plubell, Assistant
Attorney General, Helena, Montana

Ed Corrigan, Flathead County Attorney; Andrew Clegg, Deputy County
Attorney, Kalispell, Montana

Submitted on Briefs: October 15, 2014
Decided: November25, 2014

Filed:

_____
Clerk

Justice Beth Baker delivered the Opinion of the Court.

¶1     S.M. appeals the Eleventh Judicial District Court's order involuntarily committing her to the Montana State Hospital.  We restate the issues on appeal as follows:

    *1. Whether the District Court erred in concluding that S.M.'s condition required involuntary commitment.*

    *2. Whether the District Court erred in concluding that commitment to the Montana State Hospital was the least restrictive placement.*

¶2     We affirm.

### PROCEDURAL AND FACTUAL BACKGROUND

¶3     On September 12, 2013, the Montana State Hospital discharged S.M. to the care of her mother from a prior involuntary commitment.  Within two weeks, S.M., who suffers from bipolar disorder, had run out of and stopped taking her prescribed medications.  On September 27, S.M. and her mother, G.M., went to pick up S.M.'s car from a mechanic.  S.M. wandered off into a field and then a wooded area near the mechanic's shop.  G.M., realizing that S.M. was gone, went looking for her in S.M.'s car.  S.M. saw the car's headlights and thought the car was stalking her.  She wandered onto private property, where the property owner discovered her and called a crisis hotline.  S.M. was picked up and taken to the emergency room, where tests showed that her medication levels were low.  S.M. was detained on an emergency basis and hospitalized at Pathways Treatment Center in Kalispell, Montana.

¶4 On September 30, the State filed a petition for S.M.'s involuntary commitment. On October 1, the Eleventh Judicial District Court conducted an initial hearing and advised S.M. of her rights. The court held a hearing on the petition on October 4, at which Dr. Dennis Gee, a psychiatrist at Pathways, testified. Dr. Gee testified that he had first met S.M. when she was hospitalized at Pathways back in August 2012, and knew her well from three additional hospitalizations. Dr. Gee testified that S.M. suffers from bipolar disorder and was then in a manic episode with psychotic features. He testified that since S.M.'s hospitalization on September 27, Pathways had kept S.M. in a special care unit, separate from the rest of the facility, staff, and patients, because S.M. had not been able to sleep in the previous six days and had been impulsively removing her clothes and inappropriately touching others. Dr. Gee opined that S.M. needed to be hospitalized until she could stabilize on her medications.

¶5 Mental health professional Camalla Larson also testified and agreed with Dr. Gee. Larson related that S.M. was still expressing delusional thoughts—for instance, S.M. had gotten up that morning scared, not knowing where she was, and thinking that someone had changed her underwear in the middle of the night. Larson opined that S.M. could not care for her basic needs, including her health. Larson testified that the least restrictive treatment plan would require commitment to the Montana State Hospital because S.M. could not prosper under the restrictions in movement imposed at Pathways.

¶6 S.M. called G.M. to testify. G.M. explained that she and S.M. had planned to get S.M.'s prescriptions refilled after picking up the car from the mechanic. Instead of

further hospitalization, G.M. proposed that she take S.M. out to a secluded family cabin in Northwest Montana where she would care for S.M. and make sure that S.M. took her medications.

¶7 At the hearing's close, the District Court made the following findings on the record:

> I do find, first of all, that the State has shown that [S.M.] suffers from a mental disorder. I believe the State has shown by clear and convincing evidence that because of her mental disorder, she is presently unable to provide for her own basic needs, most particularly her health and safety. I also find that the State has shown, as demonstrated again by recent acts, that if left untreated, she will continue to deteriorate to the point that she will become a danger to herself.

Despite these findings, the court stated that it was not satisfied that it had enough information to conclude that commitment to the Montana State Hospital was the least restrictive course for treatment. It therefore allowed additional time for the parties to explore placement options and scheduled another hearing on the matter for October 8.

¶8 At the October 8 hearing, Dr. Gee testified again and related that S.M. was improving but still had a couple more weeks to go until she stabilized on her medications. Dr. Gee expressed reservations about discharging S.M. immediately into the care of G.M. because the secluded location of the family cabin would not permit necessary follow-up visits from Pathways' outpatient treatment team. Dr. Gee also testified that Pathways was not set up to meet S.M.'s needs adequately because S.M. does better with space and freedom to walk around, which Pathways could not provide given S.M.'s condition at that time.

4

¶9 Blake Passmore, a Mental Health Professional for the State of Montana, also testified. He opined that S.M. was still manic and not stable enough to transition to a safe house. He also explained that if S.M. was released into the care of her mother and taken to the family cabin, the outpatient treatment team would not be able to meet with S.M. the necessary number of times per week.

¶10 Finally, G.M. and S.M. testified. They promised that S.M. would take her medications if released. S.M. further testified that staying at Pathways outside the special care unit would be less restrictive than going to the Montana State Hospital.

¶11 At the end of the hearing, the District Court found that "the less restrictive alternatives that have been discussed are inadequate in light of the testimony that I heard both on the fourth and today." The court continued,

> I was hopeful that when I saw you on the fourth that we would have, as the statute describes it, a program or facility. I don't see this as either an option that I have that I can commit you to a facility or to a program or an appropriate course of treatment. I don't see sending you off with the hope that you're going to continue to take medication and thrive in a rural setting is contemplated by the statute. In fact I think it would be careless and reckless on my part to do that.

S.M. interrupted the court and asked why she could not stay at Pathways and be allowed to move around the facility freely. The court responded, "[T]he representatives of Pathways told me through their testimony they're not capable of doing that, that's not the environment that you need to be in." The court therefore ordered S.M. committed to the Montana State Hospital. On October 9, the District Court issued a written order restating

5

its findings of fact and conclusions of law, and committed S.M. to the Montana State Hospital for no longer than thirty days.

¶12 S.M. appeals the commitment order.

## STANDARDS OF REVIEW

¶13 We review commitment orders "to determine whether the [district] court's findings of fact are clearly erroneous and its conclusions of law are correct." *In re Mental Health of L.K.-S.*, 2011 MT 21, ¶ 14, 359 Mont. 191, 247 P.3d 1100. Whether a district court's findings of fact satisfy statutory requirements is a question of law. *In re L.L.A.*, 2011 MT 285, ¶ 7, 362 Mont. 464, 267 P.3d 1.

## DISCUSSION

¶14 To order a respondent's involuntary commitment to a facility, a district court must determine that (1) the respondent suffers from a mental disorder, (2) the mental disorder requires commitment, and (3) the facility is the least restrictive alternative to protect the respondent and the public and to permit effective treatment. Sections 53-21-126(1), -127(5), MCA. S.M. appeals the District Court's second and third determinations.

¶15 A person suffering from a mental illness may require commitment if one of four criteria are met. Section 53-21-127(2), MCA. The first criterion that justifies commitment is that "the respondent, because of a mental disorder, is substantially unable to provide for the respondent's own basic needs of food, clothing, shelter, health or safety." Section 53-21-126(1)(a), MCA. Alternatively, commitment may be justified if the respondent's mental disorder presents "an imminent threat of injury to the respondent

6

or to others because of the respondent's acts or omissions." Section 53-21-126(1)(c), MCA. The final consideration is whether:

> the respondent's mental disorder, as demonstrated by the respondent's recent acts or omissions, will, if untreated, predictably result in deterioration of the respondent's mental condition to the point at which the respondent will become a danger to self or to others or will be unable to provide for the respondent's own basic needs of food, clothing, shelter, health, or safety.

Section 53-21-126(1)(d), MCA. If a District Court finds that one of these criteria necessitates commitment, it must make a "detailed statement of facts upon which the court found the respondent to be . . . requiring commitment." Section 53-21-127(8)(a), MCA.

¶16    If the respondent suffers from a mental disorder that requires commitment, the district court must choose for treatment "the least restrictive alternatives necessary to protect the respondent and the public and to permit effective treatment." Section 53-21-127(5), MCA. But if the court relies solely upon the predictability of deterioration as specified in § 53-21-126(1)(d), the court may not commit the person to a state hospital. Section 53-21-127(7), MCA.

¶17    *1. Whether the District Court erred in concluding that S.M.'s condition required commitment.*

¶18    The District Court concluded that S.M.'s condition required commitment because, under § 53-21-126(1)(a), S.M. was substantially unable to care for her own health and safety, and, under § 53-21-126(1)(d), S.M.'s condition would predictably deteriorate to the point that she would become a danger to herself if she did not receive treatment.

7

¶19    S.M. argues there was insufficient evidence to support the District Court's determination that she was substantially unable to care for her own health and safety. Even if there was sufficient evidence, S.M. argues that the District Court failed to make a "detailed statement of facts" supporting this determination. Section 53-21-127(8)(a), MCA. Thus, S.M. suggests, the only criterion that could justify her commitment was the predictability of deterioration, which she claims cannot lawfully sustain a commitment to the Montana State Hospital according to § 53-21-127(7), MCA. Moreover, S.M. argues that any commitment based solely on the predictability of her deterioration would be unconstitutional.

¶20    We find sufficient evidence in the record to sustain the conclusion that S.M. could not care for her basic needs at the time of the hearings. At the October 4 hearing, two medical professionals testified that S.M. suffers from bipolar disorder, that she was in a manic phase, and that she needed to be hospitalized for further treatment. Larson testified specifically that S.M. was unable to provide for her basic needs, including her health. The opinions were accompanied by substantial evidence. Particularly, the record shows that, after S.M.'s September 12 release from the hospital, she was noncompliant with taking her medications; that led to her deterioration and to her emergency room visit on September 27. S.M.'s deteriorating condition was exampled by acts such as running away from her mother under the belief that her mother was stalking her, wandering onto strangers' properties, inappropriately removing her clothes and touching others, and believing that others were changing her underwear in the night. Though the mental

8

health professionals agreed that S.M. did not present an imminent danger to herself, the District Court did not rely on § 53-21-126(1)(c), MCA, in its findings and conclusions. Rather, it concluded that S.M.'s condition was accompanied by acts that would lead to such a danger if left untreated. The evidence supports the District Court's conclusions that S.M. was not able at the time of the hearings to care for her basic needs, including her health and safety, and that she would become a danger to herself if her condition was allowed to deteriorate.

¶21 Further, the District Court's findings of fact were sufficient to support these conclusions. In the written order, the District Court noted S.M.'s illness, her recent manic presentation, her noncompliance with medication, her expression of delusional thoughts, and the opinions of Dr. Gee and Larson that S.M. was unable to care for her basic needs.

¶22 To be sure, the District Court could have been more specific and listed more of the facts we have recited in this opinion. But that does not mean, as S.M. suggests, that the court ran afoul of the statutory guidelines. Indeed, the cases S.M. cites to support her contention are distinguishable. In *In re Mental Health of E.P.B.*, 2007 MT 224, 339 Mont. 107, 168 P.3d 662, at the end of the commitment hearing, the District Court adopted whole cloth a commitment order prepared by the State, read aloud the commitment order's conclusions of law, and then signed and entered the order. *E.P.B.*, ¶ 4. By contrast, the District Court here made independent findings of fact at S.M.'s

9

hearings that supported her commitment. For example, at the conclusion of the hearing on October 8, the court declared,

> "[I]t is my findings that it has been proven that . . . you suffer from a mental disease, specifically bipolar, that you have been in a manic phase, that as a result of . . . the behaviors that were described to me at the last hearing . . . and the fact that you are substantially unable to provide for your own basic needs, particularly your health and safety . . . and by that I mean you do not take your medication."

S.M. also cites *In re L.L.A.*, but in that case we reversed a commitment order that merely recited legal conclusions and did not describe facts particular to the respondent. *L.L.A.*, ¶ 14. Here, the District Court made findings of fact based on S.M.'s individual circumstances.

¶23 We thus affirm the District Court's determination that S.M. was, at the time of the hearings, unable to provide for her basic needs, including her health and safety. The District Court also concluded, under § 53-21-126(1)(d), MCA, that S.M. would predictably deteriorate and become a danger to herself if she did not receive treatment. S.M. does not specifically challenge this conclusion. Rather, she argues that if the predictability of deterioration were the sole basis for commitment, the District Court could not lawfully or constitutionally order S.M.'s commitment to the Montana State Hospital. Because the predictability of deterioration was not the sole basis for S.M.'s commitment, we decline to examine that argument.

10

¶24    *2. Whether the District Court erred in concluding that commitment to the Montana State Hospital was the least restrictive placement.*

¶25    S.M. challenges the District Court's conclusion that the Montana State Hospital was the least restrictive alternative for her treatment. She argues that (1) the court failed to make sufficient findings of fact, and (2) there was insufficient evidence in the record to support the District Court's conclusion.

¶26    A district court ordering commitment must make findings of fact regarding "the alternatives for treatment that were considered," "the alternatives available for treatment of respondent," and "the reason that any treatment alternatives were determined to be unsuitable for the respondent." Sections 53-21-127(8)(b)-(d), MCA. S.M. points out that the District Court's written order never specifically mentioned the possibility that S.M. might stay at Pathways for treatment, even though this possibility was discussed in the October 8 hearing. The State responds by noting that there is evidence in the record showing that Pathways was not capable of providing the treatment S.M. needed and that the court made such a finding at the conclusion of the October 8 hearing. In her reply brief, S.M. argues that what the District Court found at the October 8 hearing is irrelevant because, by law, we determine the sufficiency of findings of fact based solely on the written commitment order.

¶27    In commitment cases, we have considered a district court's oral findings in addition to its written findings. For example, in *In re Mental Health of O.R.B.*, 2008 MT 301, 345 Mont. 516, 191 P.3d 482, the respondent contended that the district court failed to make sufficient findings of fact under § 53-21-127(8), MCA. *O.R.B.*, ¶ 19. We

11

rejected that argument, in part because "the court orally detailed its findings at the conclusion of the commitment hearing." *O.R.B.*, ¶ 21; *see also L.L.A.*, ¶¶ 11-12 (holding a district court failed to meet § 53-21-127(8)'s requirements and distinguishing *O.R.B.* on the basis of *O.R.B.*'s oral findings of fact).

¶28 Further, under the doctrine of implied findings, we may consult hearing transcripts in addition to the written findings. This doctrine holds that where "'findings are general in terms, any findings not specifically made, but necessary to the determination, are deemed to have been implied, if supported by the evidence.'" *In re Mental Health of S.C.*, 2000 MT 370, ¶ 15, 303 Mont. 444, 15 P.3d 861 (quoting *Interstate Brands Corp. v. Cannon*, 218 Mont. 380, 384, 708 P.2d 573, 576 (1985)).

¶29 The written order of commitment must at the least be adequate to "apprise[ ] the receiving staff at [the commitment facility], treatment professionals, and even law enforcement who may be involved in transporting the patient, of the particular condition and behaviors that prompted hospitalization or gave rise to the need for commitment." *L.L.A.*, ¶ 21. We thus require that written orders be at least "minimally sufficient." *L.L.A.*, ¶ 13.

¶30 Here, the written order was minimally sufficient and was supported by substantial evidence. The written order includes findings that Dr. Gee, Passmore, and Larson all testified that the Montana State hospital was the least restrictive placement option for S.M.'s treatment, and that Passmore testified that other community placement options had been explored but were inadequate. The written order concludes that "there are no

12

community based treatment facilities which are adequate[,] so the Court finds that under the circumstances of this case the least restrictive treatment alternative which is necessary to protect [S.M.] and provide for effective treatment is commitment to the Montana State Hospital." These findings are consistent with the District Court's determination at the October 8 hearing that Pathways was "not the environment" that S.M. needed. The findings imply that Pathways could not provide S.M. with the type of freedom of movement that would support her stabilization, whereas the Montana State Hospital was capable of providing that freedom.

¶31 S.M. contends that the District Court ignored the treatment option of permitting her to remain at Pathways, which S.M. testified was less restrictive "as long as they let me out into the regular room." But Pathways representatives said that if S.M. remained at Pathways, she would have to remain in the special care unit, and that she would do better in a situation where she would have more stimulation. There is thus substantial support in the record for the District Court's determination that, under the circumstances of this case, the Montana State Hospital was the least restrictive placement alternative.

**CONCLUSION**

¶32 We affirm the District Court's commitment order.

/S/ BETH BAKER

We concur:

/S/ MIKE McGRATH
/S/ PATRICIA COTTER
/S/ MICHAEL E WHEAT

13

Justice Laurie McKinnon, dissenting.

¶33 The Court concludes there was sufficient evidence to support the District Court's determination that S.M. suffered from a mental disorder requiring commitment. Opinion, ¶ 20. The Court supports its conclusion with evidence that S.M. was noncompliant in taking medications and therefore, pursuant to § 53-21-126(1)(a), MCA, was "unable to provide for [her] own basic needs of food, clothing, shelter, health, or safety." Opinion, ¶ 20. It is my opinion that an individual, even one suffering from a mental disorder, may refuse to take medications absent satisfaction of the statutory criteria authorizing a court to involuntarily commit, detain, and medicate her at a state hospital. The refusal to take medication may not, by itself, serve as the basis for an involuntary commitment of the mentally ill. The Court's decision today allows the State to place in a state hospital an individual who has chosen not to take a medication—for potentially any number of reasons—where no evidence has otherwise been presented that the individual is unable to take care of her own basic needs. A person suffering from a mental illness should have the same right to refuse medication as those who are free of mental illness, unless the State can demonstrate one or more of the statutory criteria. I therefore cannot agree with the Court's resolution of Issue 1.

¶34 I do, however, believe the evidence supports the District Court's finding pursuant to § 53-21-126(1)(d), MCA—that S.M.'s mental disorder, if left untreated, would predictably result in deterioration to the point that S.M. would not be able to provide for her basic needs. The alleged constitutional infirmity of that subsection was not sufficiently raised in the trial court, and the trial court did not render a decision

addressing the subsection's constitutionality. Thus, I would decline to consider the constitutionality of the subsection on appeal, and I would affirm the District Court's determination that S.M. suffered from a mental disorder requiring her commitment pursuant to § 53-21-126(1)(d), MCA. Lastly, because it is my opinion that the evidence supports only a finding pursuant to § 53-21-126(1)(d), MCA, the District Court may not require commitment to the state hospital, but rather may place an individual in a community facility or program. Section 53-21-127(7), MCA. I therefore dissent from the Court's resolution of Issue 2.

¶35 It is undisputed that S.M. suffers from bipolar disorder, which is a qualifying mental disorder pursuant to § 53-21-102(9)(a), MCA. In determining whether commitment was required, the trial court had to consider the statutory factors set forth in § 53-21-126(1)(a) through (d). Although the State filed a petition alleging that the "imminent welfare" of S.M. required her involuntary commitment, the relevant statutory factors addressed at trial and by the Court were:

> (a) whether the respondent, because of a mental disorder, is substantially unable to provide for the respondent's own basic needs of food, clothing, shelter, health, or safety;

> .  .  .

> (d) whether the respondent's mental disorder, as demonstrated by the respondent's recent acts or omissions, will, if untreated, predictably result in deterioration of the respondent's mental condition to the point at which the respondent will become a danger to self or to others or will be unable to provide for the respondent's own basic needs of food, clothing, shelter, health, or safety. Predictability may be established by the respondent's relevant medical history.

16

In deciding whether sufficient evidence has been presented, we have repeatedly stated that "'Montana's civil commitment laws are to be strictly followed.'" *In re Mental Health of R.M.*, 270 Mont. 40, 44, 889 P.2d 1201, 1204 (1995) (quoting *In re Mental Health of S.J.*, 231 Mont. 353, 355, 753 P.2d 319, 320 (1988)). Therefore, we must be careful not to mistakenly interpret evidence of predictable deterioration as evidence that S.M. cannot currently take care of her own basic needs. The two subsections are distinct and the failure to take medication does not necessarily render a person unable to take care of her health, but may help substantiate a predictable deterioration conclusion. The key distinction is that subsection (a) requires evidence establishing that the respondent is currently unable to care for her basic needs, while subsection (d) addresses a future situation. Thus, the State must meet its burden as to the particular subsection relied upon, and the Court must be careful not to confuse the requirements of each subsection and the evidence offered in support of that section.

¶36 The Court did not address whether commitment was required under subsection (d), but rather confined its analysis to whether S.M. was able "at the time of the hearings" to "care for her basic needs, including her health." Opinion, ¶ 20. In support of its conclusion, the Court cites examples of S.M.'s conduct which, while admittedly bizarre, do not evidence an inability to provide for her own needs. Opinion, ¶ 20. The District Court's order, however, found that S.M. was unable to care for her basic needs because she failed to remain "medication compliant." There is nothing in the record, including in the testimony propounded from the State's mental health experts, indicating that S.M.'s basic needs of food, shelter, health and safety were not being provided for by either S.M.

or a family member. In fact, the State's expert witnesses testified that S.M. was not a threat to herself or others.

¶37 The Court nevertheless finds there was "substantial evidence" to support Larson's opinion that S.M. was unable to provide for her basic needs, including S.M.'s refusal to take her medications, S.M.'s belief that she was being stalked, S.M.'s inappropriate removal of her clothes when detained, S.M.'s inappropriate touching of others when detained, and S.M.'s belief that while she was detained, others were changing her underwear at night. Opinion, ¶ 20. While the State's expert may have agreed S.M. was unable to "take care of her basic needs," the testimony of Larson and Dr. Gee was in the context of S.M.'s failure to take her medications and described an individual, admittedly mentally ill, who was removed from her surroundings and placed involuntarily in confinement. There was no evidence presented that S.M., when first detained, was malnourished, naked, without shelter, unsafe, or otherwise not likely to have her basic needs attended to by either herself or her mother, with whom she was living. Although there is little dispute, especially given S.M.'s history, that she would predictably deteriorate to a point where neither she nor or a family member would be able to adequately provide for her basic needs, the evidence the Court relies upon demonstrates what can, at best, be described as bizarre behavior rather than behavior that is harmful to S.M. or others. The evidence in no way substantiates a conclusion that S.M.'s basic needs are not being met.

¶38 What is left as a basis for commitment, after removing from consideration evidence of bizarre behavior, is S.M.'s failure to adequately maintain her medication

dosages. It seems intuitively obvious that a person has a constitutionally protected interest in being left free to decide for herself whether to take a medication. The right most likely emanates from the Due Process Clause of the Fourteenth Amendment as part of the penumbra of rights inherent in the right to privacy, bodily integrity, or personal security. *See Parham v. J. R.*, 442 U.S. 584, 626, 99 S. Ct. 2493, 2516 (1979) (Brennan, J., dissenting on other grounds); *Rennie v. Klein*, 462 F. Supp. 1131, 1144-45 (D.N.J. 1978) (on motion for preliminary injunction); *Superintendent of Belchertown State Sch. v. Saikewicz*, 370 N.E.2d 417, 424 (Mass. 1977); *In re Mental Health of K.K.B.*, 609 P.2d 747, 750 (Okla. 1980); *cf. Ingraham v. Wright*, 430 U.S. 651, 673, 97 S. Ct. 1401, 1413 (1977) ("Among the historic liberties [protected by the Due Process Clause] was a right to be free from . . . unjustified intrusions on personal security."); *Breithaupt v. Abram*, 352 U.S. 432, 439, 77 S. Ct. 408, 412 (1957) ("right of an individual that his person be held inviolable"); *see generally Developments in the Law—Civil Commitment of the Mentally Ill*, 87 Harv. L. Rev. 1190, 1194-97 (1974). Certainly, if one or more of the statutory prerequisites contained in § 53-21-126(1), MCA, are first found to exist, then a court has authority to consider involuntary medication pursuant to § 53-21-127, MCA. *In re Mental Health of S.C.*, 2000 MT 370, ¶ 9, 303 Mont. 444, 15 P.3d 861. Thus, "a State cannot constitutionally confine without more a nondangerous individual who is capable of surviving safely in freedom by himself or with the help of willing and responsible family members or friends." *O'Connor v. Donaldson*, 422 U.S. 563, 576, 95 S. Ct. 2486, 2494 (1975). A finding of mental illness alone cannot justify confining an individual against her will and does not disqualify a person from preferring her own home to the

19

comforts of an institution. While the State may arguably confine a person to save her from harm, the choice not to follow a specific medical treatment remains that of the individual until she is dangerous to someone or cannot live safely in freedom. *In re Mental Health of A.S.B.*, 2008 MT 82, ¶ 44, 342 Mont. 169, 180 P.3d 625 (Gray, C.J., dissenting).

¶39 Significantly, it is only upon conclusion of the post-trial disposition that a court may order involuntary medication, provided the court first finds it necessary to protect the person or the public or to facilitate effective treatment. Section 53-21-127(6), MCA, protects an individual's interest in refusing unwanted medication unless certain factors are found to exist:

> The court may authorize the chief medical officer of a facility or a physician designated by the court to administer appropriate medication involuntarily if the court finds that involuntary medication is necessary to protect the respondent or the public or to facilitate effective treatment. Medication may not be involuntarily administered to a patient unless the chief medical officer of the facility or a physician designated by the court approves it prior to the beginning of the involuntary administration and unless, if possible, a medication review committee reviews it prior to the beginning of the involuntary administration or, if prior review is not possible, within 5 working days after the beginning of the involuntary administration. The medication review committee must include at least one person who is not an employee of the facility or program. The patient and the patient's attorney or advocate, if the patient has one, must receive adequate written notice of the date, time, and place of the review and must be allowed to appear and give testimony and evidence. The involuntary administration of medication must be again reviewed by the committee 14 days and 90 days after the beginning of the involuntary administration if medication is still being involuntarily administered. The mental disabilities board of visitors and the director of the department of public health and human services must be fully informed of the matter within 5 working days after the beginning of the involuntary administration. The director shall report to the governor on an annual basis.

20

¶40 In this instance, the Court is requiring S.M. to pursue a particular course of medical treatment which requires a specific dosage of medication in order to avoid confinement—prior to even having a trial. Importantly, S.M. is not refusing to take her medication; she is just not taking the medication in the amount the Court opines is necessary. For the State to invoke its interest of caring for its citizens as justification for the administration of treatment which results in a substantial intrusion upon the individual, the individual must first be incapable of making the decision on her own. *See Addington v. Texas*, 441 U.S. 418, 426, 99 S. Ct 1804, 1809 (1979); *Rogers v. Okin*, 634 F.2d 650, 657 (1st Cir. 1980). The predicate to confinement for failure to take medication must be the likelihood of serious harm to the individual or others. "People—mentally ill or otherwise—generally have the right to be left alone unless they are in imminent danger to those around them or are committing a criminal offense." *A.S.B.*, ¶ 46.

¶41 For the foregoing reasons, I respectfully disagree that S.M.'s failure to take her full dosage of medications may serve as a basis—absent evidence that she was unable to care for her own needs—for her involuntary commitment pursuant to § 53-21-126(1)(a), MCA. Nevertheless, the evidence did support a conclusion pursuant to § 53-21-126(1)(d), MCA, that S.M.'s mental disorder, if left untreated, would predictably result in a deterioration of S.M.'s mental condition to the point at which S.M. would become a danger to either herself or others. S.M. had a lengthy and recent history of prior involuntary commitments. Treatment of her mental disorder required medication at certain levels, which S.M. was having difficulty maintaining. S.M. offered several

21

reasons why she was having difficulty acquiring her medication, but the expert testimony left little doubt that S.M.'s mental condition would predictably deteriorate such that she would be a danger to herself. "Predictability may be established by respondent's relevant medical history." Section 53-21-126(1)(d), MCA. The evidence produced at trial substantiates a finding under subsection (d). Since I do not believe the constitutionality of subsection (d) was adequately presented to the District Court, I would affirm the District Court's order of involuntary commitment pursuant to subsection (d).

¶42 Finally, pursuant to the criteria set forth in § 53-21-127(7), MCA, a court relying solely on the criterion provided in § 53-21-126(1)(d), MCA, may order commitment only to a community facility or program. I therefore dissent from the Court's resolution of Issue 2.

/S/ LAURIE McKINNON