FILED

01/03/2017

*Ed Smith*
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 15-0489

DA 15-0489

IN THE SUPREME COURT OF THE STATE OF MONTANA

2017 MT 1

IN THE MATTER OF:

D. L. B.,

Respondent and Appellant.

APPEAL FROM:     District Court of the Tenth Judicial District,
                 In and For the County of Fergus, Cause No. DI 2015-11
                 Honorable Jon A. Oldenburg, Presiding Judge

COUNSEL OF RECORD:

        For Appellant:

                Chad Wright, Chief Appellate Defender, Kristen L. Peterson, Assistant
                Appellate Defender, Helena, Montana

        For Appellee:

                Timothy C. Fox, Montana Attorney General, Katie F. Schulz, Assistant
                Attorney General, Helena, Montana

                Thomas P. Meissner, Fergus County Attorney, Craig R. Buehler, Special
                Deputy County Attorney, Lewistown, Montana

                                Submitted on Briefs:  November 2, 2016

                                            Decided:   January 3, 2017

Filed:

                                _____
                                            Clerk

Justice Jim Rice delivered the Opinion of the Court.

¶1 D.L.B. appeals the order of the Tenth Judicial District Court, Fergus County, recommitting him for a period of up to six months to the Montana Mental Health Nursing Care Center (Nursing Care Center) in Lewistown. We affirm, and state the issue as follows:

*Did the District Court err by extending D.L.B.'s commitment to the Nursing Care Center?*

## FACTUAL AND PROCEDURAL BACKGROUND

¶2 D.L.B. is a 75-year-old male who, unfortunately, has suffered from mental illness his entire adult life. He was originally diagnosed with paranoid schizophrenia after his first psychotic episode, at age 22. Since this initial diagnosis, D.L.B. has been involuntarily committed to mental hospitals throughout his life. D.L.B.'s May 2015 Mental Health Assessment for Recommitment states that he has been involuntarily committed to mental health hospitals at least six times and that other "[r]ecords indicate [that] he [has] likely had other psychiatric hospitalizations through the years, but [complete] information is not available."[1] D.L.B.'s last four hospital commitments, in 2004, 2011, 2012, and 2014, were to the Montana State Hospital (MSH).

¶3 D.L.B.'s psychosis centers around a fear of the Nazis and of being persecuted by them. He also suffers from delusions regarding an imaginary wife and children who

---

[1] The record also includes an October 2015 Mental Health Assessment for Recommitment that was filed with the District Court on December 18, 2015, as part of a subsequent recommitment proceeding that led to the filing of another recommitment order. D.L.B. has also appealed that matter, which is pending before the Court as Cause No. DA 16-0281. Briefing has not been completed. The October 2015 Assessment was not part of the record before the District Court in the subject proceeding.

2

reside in Canada. Critically, he has a pervasive history of medication noncompliance arising from his belief that he does not suffer from a mental illness.

¶4 D.L.B.'s 53-year history of mental illness evidences a relatively predictable and cyclical pattern, typically beginning with a psychotic episode. During these episodes, he acts out and is a physical danger to himself, as well as to others. The episodes typically result in an involuntary commitment of D.L.B. to a mental health hospital, where he is medicated and begins to stabilize. After improving, D.L.B. is transferred from the hospital to a mental health nursing care facility, where supervision helps him to stay on his medication and maintain stability. After he is released from the mental health nursing care facility to a community based rehabilitation center or treatment program, he typically stops taking his medicine, leading to another psychotic episode and a repeat of the cycle.

¶5 At the July 8, 2015, recommitment hearing, the District Court verbally summarized D.L.B.'s condition as follows:

> [D.L.B.] does suffer from a mental disorder that being paranoid schizophrenia which in his case causes him to have a lack of insight in to his own mental disorders and how those affect him and leads to a persistent desire and a pattern of medication refusal and removing himself from the medication which then causes his mental disorder to spiral out of control and causes [D.L.B.] to decompensate and have to start over again with his treatment. This presents a danger to [D.L.B.] as each and every time he has to start over it takes more and more to get him back to normal and during those psychotic episodes he's a danger to himself and could be a danger to others just basically due to his lack of insight and ability to control himself.

¶6 In 2014, D.L.B. was living at a rehabilitative center in Dillon when he again refused to take his medicine. He decompensated to the point that he "believed staff at the

3

facility were contracting with the Nazi's [sic] to torture him and inflict pain on him with infrared devices." He became verbally aggressive and attempted to physically strike the staff, leading to his commitment to MSH on September 23, 2014. On March 24, 2015, after he had stabilized, D.L.B. was transferred from MSH to the Nursing Care Center. Based on his behaviors, however, D.L.B. was considered an elopement risk. At the Nursing Care Center, D.L.B. received regular medical and psychiatric care. Despite this care, D.L.B. continued to have visual hallucinations and paranoid delusions, be verbally and physically aggressive toward the staff, refuse to take his medication, and isolate himself. On June 2, 2015, the State filed the subject petition to extend D.L.B.'s commitment to the Nursing Care Center for further evaluation and treatment.

¶7 In support of the petition, the State submitted a report by Susan Stevens (Stevens), a Mental Health Professional.[2] Stevens' report explained that D.L.B. had a long history of medication noncompliance and, consequently, a recurring inability to successfully live independently in community-based placements, despite his receipt of supportive services. She also opined that:

> [A]s a result of [D.L.B.'s] mental illness he presents as a danger to self and potentially others when he is medication non-compliant. Commitment proceedings should not be dismissed. [D.L.B.] presents as a danger to self due to florid psychosis (delusions and hallucinations). He has an extensive history of becoming medication non-compliant then decompensates very quickly and becomes confused and unable to meet and maintain his most basic needs of food, clothing, shelter, health, and safety. He potentially

---

[2] Stevens holds a MS and is a LMFT. She is a Mental Health Professional, her certification number is MHF-436, and she is employed as a Psychology Specialist at the Nursing Care Center. "Mental health professional" is defined at § 53-21-102(11), MCA.

4

presents as a danger to others due to his recent history of becoming verbally and physically aggressive towards others.

¶8 On July 8, 2015, an adjudicatory hearing was held at the Nursing Care Center. Debbie Moore (Moore), Director of Nursing at the Center, testified that D.L.B. continued to exhibit characteristic behaviors of paranoid schizophrenia such as auditory hallucinations, delusions, false beliefs that people were plotting against him, and delusions of grandeur. While noting that D.L.B. was "beginning to do well," she stated that he continued to deny the need for medication and to make statements about not wanting to take medication. Moore opined that D.L.B. continued to meet the admission criteria for the Nursing Care Center based on his continued delusions, paranoid thoughts, and a lack of judgment and insight into his mental health needs. Stevens testified that the Nursing Care Center was a lesser restrictive environment than D.L.B.'s prior placement at MSH, and opined that D.L.B. was not yet ready for a less restrictive, community based placement. At the conclusion of the hearing, the District Court orally extended D.L.B.'s commitment to the Nursing Care Center for a period of not more than six months. A written order was entered on July 16, 2015, which did not specify under what statutory provisions D.L.B. was being re-committed.

¶9 D.L.B. appeals.

**STANDARD OF REVIEW**

¶10 We review commitment orders to determine whether a district court's findings of fact are clearly erroneous and its conclusions of law are correct. *In re S.G.R.*, 2016 MT 70, ¶ 13, 383 Mont. 74, 368 P.3d 1180 (citing *In re S.M.*, 2014 MT 309, ¶ 13, 377 Mont.

133, 339 P.3d 23). A finding of fact is clearly erroneous if it is not supported by substantial evidence, if the district court misapprehended the effect of the evidence or if, after a review of the entire record, we are left with a definite and firm conviction that a mistake had been made. *In re S.G.R.*, ¶ 13 (citing *In re Mental Health of L.K.-S.*, 2011 MT 21, ¶ 14, 359 Mont. 191, 247 P.3d 1100 [hereinafter *In re L.K.-S.*]). Whether a district court's findings of fact meet statutory requirements is a question of law that we review for correctness. *In re S.G.R.*, ¶ 13 (citing *In re L.L.A.*, 2011 MT 285, ¶ 6, 362 Mont. 464, 267 P.3d 1).

**DISCUSSION**

¶11 *Did the District Court err by extending D.L.B.'s commitment to the Nursing Care Center?*

¶12 Arguing that Montana's involuntary commitment statutes require that a recommitment meet the identical standards of an original commitment, D.L.B. contends that the District Court's findings are insufficient to satisfy the commitment criteria under § 53-21-126(1)(a), (b), or (c), MCA, and that the evidence satisfies recommitment only under § 53-21-126(1)(d), MCA. Commitments ordered pursuant to § 53-21-126(1)(d), MCA, may only be made "to a community facility or program or an appropriate course of treatment . . . and may not require commitment at the state hospital, a behavioral health inpatient facility, or the Montana medical health nursing care center." Section 53-21-127(7), MCA. D.L.B. thus argues that his recommitment to the Lewistown Nursing Care Center violates these provisions. In essence, D.L.B. asserts that these statutes must be narrowly interpreted and that the criteria stated in § 53-21-126(1)(a)-(d),

6

MCA, are the only appropriate considerations in determining whether recommitment should be ordered.

¶13 The State responds that the § 53-21-126(1), MCA, criteria must be evaluated in the context of a recommitment. Noting that this statute states that, when "determining whether the respondent requires commitment and the appropriate disposition. . . ., the court *shall consider*" the listed criteria, the State argues the statute does not prohibit consideration of additional circumstances related to a respondent, including, in a recommitment proceeding, a respondent's relevant medical history and continuing treatment requirements. Section 53-21-126(1), MCA (emphasis added). The State contends that, when placed in this context, the District Court's findings are sufficient to support recommitment.

¶14 Section 53-21-128(1), MCA, provides that "[n]ot less than 2 weeks" before the expiration of a commitment, the professional person in charge of the patient at the place of commitment may petition the district court "for extension of the commitment period." The same hearing procedures used for an initial commitment are followed in a recommitment proceeding, except the respondent is not entitled to a jury trial. Section 53-21-128(1)(c), MCA. If the district court "finds that the patient continues to suffer from a mental disorder and to require commitment, the court shall order commitment as set forth in 53-21-127." Section 53-21-128(1)(d), MCA. In turn, § 53-21-127(7), MCA, governs dispositional hearings, commitment options, least restrictive alternatives, and

necessary findings of fact to be made by the district court, and provides that "[s]atisfaction of any one of the criteria listed in 53-21-126(1) justifies commitment."

¶15    In relevant part, § 53-21-126(1), MCA, states:

> In determining whether the respondent requires commitment and the appropriate disposition under 53-21-127, the court shall consider the following:
>    (a) whether the respondent, because of a mental disorder, is substantially unable to provide for the respondent's own basic needs of food, clothing, shelter, health, or safety;
>    (b) whether the respondent has recently, because of a mental disorder and through an act or an omission, caused self-injury or injury to others;
>    (c) whether, because of a mental disorder, there is an imminent threat of injury to the respondent or to others because of the respondent's acts or omissions; and
>    (d) whether the respondent's mental disorder, as demonstrated by the respondent's recent acts or omissions, will, if untreated, predictably result in deterioration of the respondent's mental condition to the point at which the respondent will become a danger to self or to others or will be unable to provide for the respondent's own basic needs of food, clothing, shelter, health, or safety.

As noted by D.L.B., if the court relies solely upon the criterion provided in subsection (1)(d), "the court may require commitment only to a community facility or program," and not "the Montana mental health nursing care center." Section 53-21-127(7), MCA.

¶16    The recommitment statute, § 53-21-128, MCA, incorporates the procedures and standards for commitment provided in §§ 53-21-126 and -127, MCA, but states the inquiry is whether the respondent "continues to suffer" from a mental disorder and continues "to require commitment." Section 53-21-128(1)(d), MCA. The recommitment statute thus includes a time component, which requires a determination of whether the respondent's condition has improved, since his original commitment, to the point where

8

he no longer suffers from a mental disorder requiring commitment. The inquiry can include consideration of the respondent's medical history, the original commitment proceeding, the treatment received since the original commitment, as well as the respondent's current status and treatment needs. While the stated legal standards for recommitment are the same as in an original commitment proceeding, the record and necessary considerations may not be. Further, the longer-term view called for by the recommitment statute permits an additional perspective of the evidence. Of course, respondents are not bound by their past medical histories, but histories and continuing treatment requirements are relevant considerations in the recommitment context.

¶17 Unfortunately, in its Order for Recommitment, the District Court neglected to cite in its findings and conclusions to the particular criteria under § 53-21-126(1), MCA, upon which it based D.L.B.'s recommitment to the Nursing Care Center, a problem we have previously highlighted. *See generally, e.g.*, *In re B.D.*, 2015 MT 339, ¶ 8, 381 Mont. 505, 362 P.3d 636 (the District Court's "failure to specify the subsection relied upon [for commitment] was clearly an oversight to be avoided."). Similarly, we have noted the paucity of written findings in commitment orders, which we are again presented with in this case. *See generally, e.g.*, *In re M.P.-L.*, 2015 MT 338, ¶ 20, 381 Mont. 496, 362 P.3d 627 (concluding that while "the District Court's written findings are bare-boned," they provided "sufficient reasoning to justify the commitment."). We have looked to a court's oral findings to supplement its written findings, *In re S.M.*, ¶ 27, and have applied the doctrine of implied findings that were necessary to the court's determination. *In re S.M.*,

9

¶ 28; *In re M.P.-L*, ¶ 20; *In re S.G.R.*, ¶ 21.  However, we will "decline to expand the doctrine of implied facts to the degree necessary to affirm a commitment order that is beyond 'bare-bones' and 'spartan.'"  *In re C.C.*, 2016 MT 174, ¶ 23, 384 Mont. 135, 376 P.3d 105.  These holdings underscore the necessity of "strict adherence" by district courts with the statutory requirements governing involuntary commitment proceedings, despite the commonly urgent nature of the proceedings, *In re L.K.-S.*, ¶ 15, including the entry of findings of fact.  Section 53-21-127(8), MCA.

¶18    Our review of the record leads to the conclusion that the District Court's findings of fact establish a need for continued commitment to the Nursing Care Center under § 53-21-126(1)(a), MCA.  D.L.B. "continues to suffer," § 53-21-128(1)(d), MCA, from a mental disorder that renders him "substantially unable to provide for [his] own basic needs of food, clothing, shelter, health, or safety."  Section 53-21-126(1)(a), MCA.  The District Court's oral findings determined that D.L.B. continues to suffer from paranoid schizophrenia, causing him to "have a lack of insight in to his own mental disorders" and a lack of "ability to control himself," including a continuing "medication refusal" that has not resolved, even with current treatment.  The record includes a May 28, 2015 Mental Health Assessment for Recommitment, which noted D.L.B. has continuing problems with hallucinations and paranoid delusions along with verbal and physical aggressiveness toward staff, including:

> 05/19/15    When [D.L.B.] asked why he had to be here Dr. Whitworth stated 'because you are mentally ill'.  [D.L.B.] *replied in a loud voice* 'The hell I am doctor, the hell I am'. . . When [D.L.B] was asked about prior reports of Nazi's [sic] *he leaned forward in his chair and shouted at Dr.*

10

*Whitworth* 'The Nazi's [sic] are right here in this fuckin room doctor, they are invisible'.

. . .

04/06/15     [D.L.B.] exhibited both grandiose and paranoid delusions (e.g. Nazi's [sic] are trying to torture him, invisible wife and children) [ . . . D.L.B.] did inquire about taxi service and related 'I fled Washington for my life, I put on heavy clothes and walked away before the Nazi's [sic] found me.  I may need to flee here if they find me!' *[D.L.B.] is an elopement risk due to his delusions.*

. . .

04/01/15     Nursing noted "[D.L.B.] is refusing to take any of his breakfast meds. . . *'I'm refusing; take me back to Warm Springs'.*  Gave a cooling off time, reapproached, he hangs his head and refuses to answer or acknowledge . . . []

(Internal punctuation original; emphasis added.)

¶19     Consistent with this evidence, the District Court's written findings state that D.L.B. continues to suffer from paranoid schizophrenia, and cites Stevens' testimony that D.L.B. "is a danger to himself due to his lack of insight . . . ."  Stevens' report stated "[D.L.B.] presents as a danger to self due to florid psychosis (delusions and hallucinations) . . . .  He potentially presents as a danger to others due to his recent history of becoming verbally and physically aggressive toward others," which we can add to the District Court's findings by implication. *In re S.M.*, ¶ 28.  The District Court found "the most appropriate and least restrictive placement for [D.L.B.] is the Montana Mental Health Nursing Center," and the treatment plan filed with the District Court was appropriate, subject to "regular review."  The District Court authorized involuntary

11

administration of medication to D.L.B., finding that "he is unable to appreciate the necessity for a proper medication regimen to control his mental illness."

¶20 Although the District Court's findings were sparse, we conclude they were sufficient to support a conclusion that recommitment to the Nursing Care Center was authorized under §§ 53-23-128(1)(d) and 53-21-126(1)(a), MCA. Despite treatment, D.L.B.'s condition has not sufficiently improved, since his original commitment, to the point where he no longer suffers from a mental disorder requiring commitment.

¶21 Affirmed.

/S/ JIM RICE

We concur:

/S/ MICHAEL E WHEAT
/S/ BETH BAKER
/S/ JAMES JEREMIAH SHEA

Justice McKinnon, dissenting.

¶22 These proceedings are indistinguishable from *S.G.R.* in which I dissented because the order extending commitment was statutorily insufficient for failing to set forth adequate factual findings and for failing to indicate which subsection, (a), (b), (c), or (d), required recommitment under § 53-21-126(1), MCA. Again, this Court combs the transcript to "imply" both factual findings and conclusions of law, despite the statute clearly requiring "a detailed statement of the facts upon which the court found the

12

respondent to be suffering from a mental disorder and requiring commitment[.]" Section 53-21-127(8)(a), MCA. We have often "stressed the critical importance of strict compliance with the statutory requirements addressing involuntary commitment." *In re C.C.*, ¶ 14.

¶23 Here, the statutory language of Montana's involuntary commitment statute requires that an extension of a commitment meet the standards of an original commitment. *See* § 53-21-126(1), MCA (providing that for an original commitment the court must determine the person suffers from a mental disorder and "requires commitment"); § 53-21-128(1)(d), MCA (providing that for an extended commitment the court must determine the person continues to suffer from a mental disorder and to "require commitment"). Thus, the statutory criteria to grant the original commitment under § 53-21-126(1), MCA, also applies to an extension of a commitment pursuant to § 53-21-128(1)(d), MCA.

¶24 Section 53-21-126(1), MCA, explains that "requiring commitment" means the court consider whether there is sufficient evidence of at least one of the four criteria which result from the person's mental disorder. In my opinion, for the simple reason that the statutory provisions are plain and that involuntary commitment statutes are to be strictly construed, this Court errs when it adds to the four criteria which justify commitment by including a "time component." Opinion, ¶ 16. The Legislature has indicated that both initial commitments and recommitments are not *pro forma* proceedings. Even where the initial confinement of an individual was constitutionally

13

permissible, the confinement may not constitutionally continue if the reasons for the initial confinement no longer exist. *See O'Connor v. Donaldson*, 422 U.S. 563, 574-75, 95 S. Ct. 2486, 2493 ("Nor is it enough that [the respondent's] original confinement was founded upon a constitutionally adequate basis, if in fact it was, because even if his involuntary confinement was initially permissible, it could not constitutionally continue after that basis no longer existed.").

¶25 Here, we have no indication from this Court's opinion or the District Court's order which statutory criteria were satisfied making it necessary to recommitment D.L.B. I therefore would reverse the District Court's order of commitment, based upon the foregoing and the analysis I set forth more thoroughly in *In re S.G.R.*, ¶¶ 26-31 (McKinnon J., dissenting). To the extent we hold otherwise, I dissent.

/S/ LAURIE McKINNON

14